**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

CHARLES CODY MCKENZIE, on behalf of himself and all others similarly situated,

        Plaintiff,

    v.

IOVATE HEALTH SCIENCES U.S.A INC. and GNC CORP.,

        Defendants.

---

## CLASS ACTION COMPLAINT

### JURY TRIAL DEMANDED

Plaintiff Charles Cody McKenzie ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

### NATURE OF THE ACTION

1.      This is a class action lawsuit against Defendants Iovate Health Sciences U.S.A., Inc. ("Iovate") and General Nutrition Corp. ("GNC") for misrepresenting Epiq Isolate Protein Powder (the "Product") as: (i) having "20 Grams [Of] Protein" per serving; and (ii) being comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins" (collectively, the "Misrepresentations"). In reality, Epiq Isolate Protein Powder is "spiked" with additional and

unnecessary free-form amino acids, non-protein amino acids, and a litany of other non-protein

ingredients.  As a result of Defendants' practices, the Product (a) does not contain "20 Grams

[Of] Protein" per serving, and (b) is not comprised of protein from a "100% Protein Isolate

Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100%

isolate proteins."

2.      The protein industry is a growing and highly-competitive business environment:

"during the forecast period, [the market for] protein products is expected to grow by 62% to

reach US $7.8 billion in 2018."[1]  However, the wholesale price of whey protein has continually

increased in recent years and is typically purchased for roughly $15 to $18 per kilogram,

resulting in relatively low profit margins for manufacturers.

3.      In an effort to reduce its costs, Iovate adds cheaper free-form amino acids,

non-protein amino acids, and other non-whey ingredients to Epiq Isolate Protein Powder,

including but not limited to taurine and glycine.  Thus, the Product is _not_ comprised of protein

from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates"

and contains "only 100% isolate proteins."

4.      Iovate adds these ingredients to increase the nitrogen content of the Product.

Nitrogen is the "marker" used by a common test as a rough estimate of the amount of protein in a

product, but it is not a direct measurement of the actual protein content.  By adding nitrogen-rich

ingredients, Iovate's products appear to contain more protein than they actually do.  In fact,

**independent laboratory testing shows that Epiq Isolate Protein Powder only contains 15**

---

[1] _See_ http://www.euromonitor.com/sports-nutrition-in-the-us/report.

**grams of protein, or approximately 25% less than advertised**, after accounting for additives like taurine and glycine.

5.    This act is commonly referred to as "protein-spiking," "nitrogen-spiking," or "amino-spiking," and was evidenced recently in 2007 when a wide variety of pet foods were recalled due to adulteration with melamine, a compound that contains 67% nitrogen by mass.  In the wake of the scandal, *USA Today* reported that, "A leading theory is that [melamine] was added to fake higher protein levels."[2]  The issue arose again in 2008 when a variety of Chinese baby formulas were found to be adulterated with melamine, which was similarly added to increase the apparent protein content in the affected products.[3]

6.    Despite knowledge that "protein-spiking" is misleading to consumers, Defendants continue to advertise, distribute, label, manufacture, and market Epiq Isolate Protein Powder in a misleading and deceptive manner.

## THE PARTIES

7.    Plaintiff Charles Cody McKenzie is a citizen of Colorado who resides in Aurora, Colorado.  Plaintiff McKenzie is a health-conscious consumer with an active lifestyle, who is a member of the United States Coast Guard.  In or about February 2015, Plaintiff McKenzie purchased Epiq Isolate Protein Powder from a GNC retail store located in Aurora, Colorado for approximately $59.99.  In 2014, Plaintiff McKenzie also purchased Epiq Isolate Protein Powder

---

[2] *See* Melamine In Pet Food May Not Be Accidental,
http://usatoday30.usatoday.com/money/industries/2007-04-19-pet-food-usat_n.htm.

[3] *See* Protein Adulteration In China, http://en.wikipedia.org/wiki/Protein_adulteration_in_China ("These adulterants can be used to inflate the apparent protein content of products, so that inexpensive ingredients can pass for more expensive, concentrated proteins.").

in Hawaii and Kentucky.  Prior to purchasing Epiq Isolate Protein Powder, Plaintiff McKenzie

reviewed the product's labeling and packaging.  Specifically, he saw and relied upon the

representations that Epiq Isolate Protein Powder:  (i) has "20 Grams [Of] Protein" per serving;

and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100%

whey, milk, and casein isolates" and contains "only 100% isolate proteins."  In making his

purchase, Plaintiff McKenzie understood these representations to be warranties that (a) Epiq

Isolate Protein Powder does, in fact, have "20 Grams [Of] Protein" per serving, and that (b) it is,

in fact, comprised of protein from a "100% Protein Isolate Matrix" that is made from "100%

whey, milk, and casein isolates" and contains "only 100% isolate proteins."  In reliance on these

representations and warranties, Plaintiff McKenzie paid a tangible increased cost for Epiq Isolate

Protein Powder, which was worth less than represented because the Product does not contain "20

Grams [Of] Protein" per serving, and is not comprised of protein from a "100% Protein Isolate

Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100%

isolate proteins."  Accordingly, these representations and warranties were part of the basis of the

bargain, in that Plaintiff McKenzie attributed value to these promises and would not have

purchased Epiq Isolate Protein Powder, or would have only paid for the protein actually

delivered by the Product, if he knew the truth about its protein content and composition.

Ultimately, Plaintiff McKenzie used the Product as directed but did not receive "20 Grams [Of]

Protein" per serving or a Product comprised of protein from a "100% Protein Isolate Matrix" that

is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."

Plaintiff McKenzie also understood that in making the sale, GNC was acting with the knowledge

and approval of Iovate and/or as the agent of Iovate.  Plaintiff McKenzie further understood that

4

the purchase involved a direct transaction between himself and Iovate, because the purchase came with Iovate's representation and warranty that the Product contains "20 Grams [Of] Protein" per serving, and is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."

8.      Defendant Iovate Health Sciences U.S.A., Inc. is a Delaware corporation with its principal place of business located at 1105 North Market Street, Suite 130, Wilmington, Delaware.  Iovate Health Sciences U.S.A., Inc. designed, manufactured, promoted, marketed, distributed, and sold Epiq Isolate Protein Powder across the United States, including to hundreds of thousands of consumers in Colorado, Hawaii, and Kentucky.

9.      Defendant General Nutrition Corp. ("GNC") is a Pennsylvania corporation with its principal place of business located at 300 Sixth Avenue, Pittsburgh, Pennsylvania.  GNC is a leading retailer in the United States of dietary supplements.  GNC, through a partnership with Iovate, designed, manufactured, promoted, marketed, distributed, and sold Epiq Isolate Protein Powder across the United States, including to hundreds of thousands of consumers in Colorado, Hawaii, and Kentucky.[4]

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11.      This Court also has subject matter jurisdiction over this action pursuant to 28

---

[4]      http://www.prnewswire.com/news-releases/gnc-launches-new-global-epiq-sports-nutrition-for-epiq-performance-187880191.html (last visited March 25, 2015).

U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

12.     This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within Colorado, such that Defendants have significant, continuous, and pervasive contacts with the State of Colorado.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial district, including his purchase of Epiq Isolate Protein Powder.

## FACTUAL BACKGROUND

### The Differences Between Whey Protein And Free-Form Amino Acids

14.     Whey is a complete protein source, in that it contains all the essential amino acids the human body needs to build protein-based compounds such as muscle tissue, skin, fingernails, hair, and enzymes.  One's daily protein needs depend on his or her size, gender, and activity levels, although it likely amounts to somewhere between 46 grams and 56 grams for most individuals.  For athletes, daily protein requirements are well over 100 grams, which is often difficult to obtain from eating food alone.  Whey protein powder is considered an especially valuable source of protein because it is rich in branched-chain amino acids – leucine, isoleucine, and valine – which are metabolized directly within the muscles as opposed to being processed in the liver first.

15.     According to the 2005 dietary reference intake ("DRI") guidance from the

National Academy of Sciences, protein is comprised of long links of certain types of amino acids. Stated otherwise, certain types of amino acids are the "building blocks" of protein.

16.     However, other types of amino acids, such as taurine (an ingredient in Epiq Isolate Protein Powder), is not naturally found in whey protein and is not processed by the body into protein. "Although most amino acids are needed to build protein, taurine does not help to build muscle because it doesn't link with other amino acids or the building blocks of protein," explains Roberta Anding, RD, American Dietetic Association spokesperson and sports dietitian for the Houston Texans football team.

17.     Furthermore, although amino acids are the building blocks of protein, they do not have the same beneficial effects of whole protein when they are free-form (*i.e.*, not part of a complete protein). In fact, several studies have shown that protein is absorbed more effectively than free-form amino acids in isolation.[5]

18.     First, at least one study was conducted to determine whether the positive effects of whey protein ingestion on the accrual of muscle protein are due solely to its constituent amino acids, or whether the ingestion of complete proteins is more beneficial. The study included a comparison of three trial groups. The first group was provided intact whey protein, in the form of whey protein powder. The other two groups were provided free-form amino acids in isolation. The researchers concluded that ingestion of complete whey protein improves skeletal muscle protein accrual through mechanisms that are beyond those attributed to free-from amino

---

[5] *See, e.g.*, Mauro G. Di Pasquale, *Amino Acids and Proteins for the Athlete: The Anabolic Edge* 190 (2d ed. 2008).

acids in isolation.[6]

19.     Second, another study found that "the lack of recovery after immobilization-induced atrophy during ageing is due to an 'anabolic resistance' of protein synthesis to amino acids during rehabilitation."  The study's results "highlight a novel approach to induce muscle mass recovery following atrophy in the elderly by giving soluble milk protein or high protein diets."[7]

20.     Third, yet another study concluded that, "the bound form of an EAA [essential amino acid] may be more efficiently utilized than when delivered in its free-form [in isolation]."[8]

**Iovate's False And Misleading Labeling Of Epiq Isolate Protein Powder**

21.     Epiq Isolate Protein Powder features the ingredient sought by millions of American consumers, "protein," by prominently featuring it on the Products' labeling.  The Product's labeling plainly states that the Product:  (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."

---

[6] Christos S. Katsanos, *et al.*, *Whey Protein Ingestion In Elderly Results In Greater Muscle Protein Accrual Than Ingestion Of Its Constituent Essential Amino Acid Content*, 28 Nutr. Res. 651 (Oct. 2008), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2612691.

[7] Hugues Magne, *et al.*, *Contrarily To Whey And High Protein Diets, Dietary Free Leucine Supplementation Cannot Reverse The Lack Of Recovery Of Muscle Mass After Prolonged Immobilization During Ageing*, 590 J. of Physiology 2035 (Apr. 2012), *available at* http://jp.physoc.org/content/590/8/2035.long.

[8] Juha J. Hulmi, *et al.*, *Effect Of Protein/Essential Amino Acids And Resistance Training On Skeletal Muscle Hypertrophy:  A Case For Whey Protein*, 7 Nutrition & Metabolism 51 (2010), *available at* http://www.nutritionandmetabolism.com/content/7/1/51.



**EPIQ™** is a line of guaranteed clean, powerful, and effective supplements formulated for elite athletes who demand the highest quality for EPIQ™ performance.

**EPIQ™ Guaranteed Supplements are:**
- Free of banned substances
- Free of artificial colors or dyes
- Free of harmful impurities
- Free of undeclared ingredients
- Developed with scientifically researched key ingredients
- Manufactured according to current Good Manufacturing Practices (cGMP) standards, as is required for all dietary supplements
- Made in the U.S.A. from international and domestic ingredients

**EPIQ™ ISOLATE – Rapid & Sustained-Release Protein Isolate**
When only an EPIQ™ performance will suffice, don't leave your muscle growth and recovery to a sugar and fat-laden protein formula. You need the best and that is EPIQ™ ISOLATE. The powerful formula contains only 100% isolate proteins including fast-acting whey protein isolate and sustained-release milk and casein protein isolate, which all are low in fat. These highly bioavailable protein sources are easily digested and utilized by the body. Whether you're a hardcore elite athlete, weekend warrior, or daily grinder in the gym, consuming a daily ultra-clean protein powder is vital to taking your performance to the next level.▲

**What Makes the Formula EPIQ™?**
- Ultra-clean protein from 100% whey, milk and casein isolates.
- Formulated with a digestive enzyme matrix.
- Delicious, great-tasting shake that is low in fat and contains only 1g of sugar.

### ADAPTIVE DOSING PROTOCOL

**For Active Adults – 1 SCOOP**

| 20g PROTEIN | 1.5g FAT | 3g CARBS | 100mg DIGESTIVE ENZYMES |
|---|---|---|---|

**For Serious Athletes & Weight Trainers – 3 SCOOPS**

| 60g PROTEIN | 4.5g FAT | 9g CARBS | 300mg DIGESTIVE ENZYMES |
|---|---|---|---|

STACK WITH **EPIQ™ RIPPED**




SCIENTIFICALLY STUDIED KEY INGREDIENTS

22.     However, the Product's "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins" claim is false.  In fact, Epiq Isolate Protein Powder contains, for the purposes of "protein-spiking," free-form amino acids, including glycine.  Independent laboratory testing shows Epiq Isolate Protein Powder contains 2.4 grams of glycine per serving.

23.     Even worse, Epiq Isolate Protein Powder includes the non-protein amino acid taurine, which is not naturally found in protein and is not processed by the body into protein.  Independent laboratory testing shows Epiq Isolate Protein Powder contains 2.15 grams of taurine per serving.

24.     Moreover, Epiq Isolate Protein Powder includes a litany of other non-protein ingredients: sunflower-based creamer, natural and artificial flavor, maltodextrin, cellulose gum, carrageenan, xanthan gum, sucralose, acesulfame-potassium, soy lecithin, and sodium hexametaphosphate.  The complete list of ingredients is as follows:

**OTHER INGREDIENTS: ISOLATE PROTEIN MATRIX** (FROM MILK PROTEIN ISOLATE, WHEY PROTEIN ISOLATE, AND ISOLATE-GRADE CALCIUM CASEINATE), **PROTEIN SYNTHESIS AND RECOVERY BLEND** (TAURINE, GLYCINE, L-LEUCINE, L-ISOLEUCINE, L-VALINE, AND L-CARNITINE L-TARTRATE), SUNFLOWER-BASED CREAMER (SUNFLOWER OIL, INULIN, SODIUM CASEINATE, MONO- AND DIGLYCERIDES, DIPOTASSIUM PHOSPHATE, SODIUM SILICOALUMINATE, TOCOPHEROLS [AS PRESERVATIVE]), NATURAL AND ARTIFICIAL FLAVORS, MALTODEXTRIN, GUM BLEND (CELLULOSE GUM, CARRAGEENAN, XANTHAN GUM), SUCRALOSE, ACESULFAME-POTASSIUM, SOY LECITHIN, SODIUM HEXAMETAPHOSPHATE. **CONTAINS MILK, SOY AND WHEAT INGREDIENTS. PROCESSED IN A FACILITY THAT ALSO PROCESSES EGG, SHELLFISH, FISH, TREE NUTS, AND PEANUT INGREDIENTS.**

25.     The presence of these "protein spiking" agents and other ingredients necessarily means that Epiq Isolate Protein Powder is not comprised of "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."

26.     Moreover, the presence of free-form amino acids, non-protein amino acids, and a

litany of other non-whey ingredients necessarily means that Epiq Isolate Protein Powder does not contain "20 Grams [Of] Protein" per serving.  Simply put, consumers are misled into believing that  every gram of protein in the product is comprised solely of 100% protein.  In actuality, independent laboratory testing shows that 5 grams (or 25%) of the Product's protein content is comprised of glycine and taurine.

27.     Furthermore, Epiq Isolate Protein Powder does not contain "20 Grams [Of] Protein" per serving due to the inclusion of ingredients added for the purpose of "protein spiking," such as glycine and taurine.  Independent laboratory testing shows that Epiq Isolate Protein Powder only contains 15 grams of protein per serving, approximately 25% less than advertised.

**Defendant GNC's Liability**

28.     Defendant GNC partners with Iovate to design, manufacture, promote, market, distribute, and sell Epiq Isolate Protein Powder.

29.     Defendant GNC incorporates all of the Epiq Isolate Protein Powder's label claims and product images described herein on its website at http://gnc.com/.

30.     Based on its partnership with Iovate, GNC reviewed all labels and marketing materials of Epiq Isolate Protein Powder, and had the ability to change the false and misleading Misrepresentations, request different product formulation, and/or ultimately reject the Product from being sold in its brick/mortar retail stores and online store.

31.     GNC also had the ability to obtain certificates of analysis for review prior to approving the Product for sale in its stores and website.

32.     Ironically, GNC has been a member of the American Herbal Products Association

("AHPA"), an organization of dietary supplement manufacturers, since at least 2003.  AHPA has condemned "protein-spiking" and issued a standard for manufacturers for measuring protein which expressly "exclude[es] any 'non-protein nitrogen-containing substances' when counting total protein content."[9]

33.     Additionally, GNC has also set up an informational website called "Is Your Protein Scamming You?" [10]  On this site, GNC criticizes the practice of "protein-spiking," while simultaneously selling Epiq Isolate Protein Powder online and in its retail stores.  GNC's informational website explains:

> [M]any protein products on the market are taking part in a practice called "protein spiking" or "amino spiking" that is cheating their customers.  Independent testing confirms that these protein supplements use added ingredients to spike their protein test results, making it appear that the products contain more protein than they actually do.
>
> You can feel confident when you take home a GNC product because we guarantee that each and every one of our more than 300 GNC protein supplements contains the full amount of protein stated on the label and is **100% Real Protein with NO protein spiking.  In fact, we GUARANTEE it!**
>
> ...
>
> In order to accurately calculate the amount of real protein in a protein supplement, the nitrogen from other ingredients such as amino acids betaine and creatine must be subtracted from the total to determine the real protein amount.  Some protein supplement companies use these ingredients to spike their protein test results because they do not subtract the nitrogen from these other sources.
>
> This practice is referred to as "protein spiking" or "amino spiking."

---

[9] *See* http://www.ahpa.org/Default.aspx?tabid=441 (Apr. 1, 2014).

[10] *See* http://www.gnclivewell.com/realprotein/.

It is when ingredients that are not whole proteins are being used to spike protein test results.  (emphasis in original).

34.     GNC's informational website also offers the "GNC Guarantee":

•     Every GNC protein product contains 100% Real Protein with no overstated protein values.

•     GNC never spikes protein amounts, ever!

•     GNC proudly stands behind the quality, potency and taste of our protein supplements – Guaranteed!

35.     In connection with the "GNC Guarantee," the informational website also offers

GNC's seal of approval, assuring consumers that GNC's products are "One Hundred Percent

Real Protein Guarantee – No Protein Spiking":



36.     Each of these representations, warranties, and guarantees are false and

misleading.  Epiq Isolate Protein Powder is not comprised of "100% Protein Isolate Matrix" that

is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins,"

and does not contain "20 Grams [Of] Protein" per serving.  Rather, it is spiked with free-form

amino acids, non-protein amino acids, and a litany of other non-protein ingredients

**Defendants' Conduct Harmed Plaintiff And Class Members**

37.     Plaintiff and members of the Class and the Colorado, Hawaii, and Kentucky

14

Subclasses (as defined below) were in fact misled by Defendants' Misrepresentations regarding the true nature of Epiq Isolate Protein Powder.

38.     The difference between Epiq Isolate Protein Powder as promised and the Product as sold is significant.  First, the Product is not comprised of "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins," as represented.  Second, the amount of actual protein provided, and the measure of protein per serving, has real impacts on the benefits provided to consumers, and the actual value of the Product itself.

39.     As aforementioned, whey, milk, and casein proteins are superior to free-form amino acids as a protein source.  Consumers, therefore, are getting an inferior product in comparison to what they bargained for because the product is not comprised of "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins," but instead contains free-form amino acids, non-protein amino acids, and other non-protein ingredients.

40.     Furthermore, consumers are left with a product that contains less protein than represented, due to the presence of "protein-spiking" ingredients.  In fact, independent laboratory testing shows that Epiq Isolate only contains 15 grams of protein per serving when accounting for glycine and taurine.  That is approximately 25% less than represented.

41.     Plaintiff and members of the Class and the Colorado, Hawaii, and Kentucky Subclasses would not have purchased Epiq Isolate Protein Powder, or would have only paid for the protein actually delivered by Epiq Isolate Protein Powder, if they had known the truth regarding the Product.

## CLASS ACTION ALLEGATIONS

42.    Plaintiff seeks to represent a class defined as all persons in the United States who purchased Epiq Isolate Protein Powder (the "Class") and subclasses of Class members who purchased Epiq Isolate Protein Powder in Colorado (the "Colorado Subclass"), in Hawaii (the "Hawaii Subclass"), and in Kentucky (the "Kentucky Subclass").  Excluded from the Class and Subclasses are any entity in which Defendants have a controlling interest, and officers or directors of Defendants.

43.    Members of the Class and the Colorado, Hawaii, and Kentucky Subclasses are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and the Colorado, Hawaii, and Kentucky Subclasses number in the millions.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third party retailers and vendors.

44.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to, whether Defendants' labeling, marketing, advertising, and promotion of Epiq Isolate Protein Powder was false and misleading.

45.    The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff was exposed to Defendants' false and misleading labeling, marketing, advertising, and promotion, purchased Epiq Isolate Protein Powder, and suffered a loss as a result of that purchase.

46. Plaintiff is an adequate representative of the Class and the Colorado, Hawaii, and Kentucky Subclasses because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

47. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class and Colorado, Hawaii, and Kentucky Subclass members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## <u>COUNT I</u>
### (Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*)

48. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

49. Plaintiff brings this claim individually and on behalf of members of the Class and the Colorado, Hawaii, and Kentucky Subclasses against all Defendants.

50. Epiq Isolate Protein Powder is a consumer product as defined in 15 U.S.C.

17

§ 2301(1).

51.　　Plaintiff and Class members are consumers as defined in 15 U.S.C. § 2301(3).

52.　　Defendants are suppliers and warrantors as defined in 15 U.S.C. §§ 2301(4) and (5).

53.　　In connection with the sale of Epiq Isolate Protein Powder, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), by making express warranties that Epiq Isolate Protein Powder:  (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."  Thus, a reasonable consumer would expect that Epiq Isolate Protein Powder does, in fact, contain 20 grams of protein per serving, and is, in fact, comprised of 100% protein isolate matrix that is made from 100% whey, milk, and casein isolates, and contains only 100% isolate proteins.

54.　　However, Epiq Isolate Protein Powder does not conform to the express warranties because the Product does _not_, in fact, contain 20 grams of protein per serving, and is _not_, in fact, comprised of 100% protein isolate matrix that is made from 100% whey, milk, and casein isolates, and contains only 100% isolate proteins.  Rather, independent laboratory testing shows that Epiq Isolate Protein Powder contains approximately 15 grams of protein per serving, or approximately 25% less than advertised, when accounting for taurine and glycine.

55.　　By reason of Defendants' breach of express warranty, Defendants violated the statutory rights due to Plaintiff and Class members pursuant to the MMWA, thereby damaging Plaintiff and Class members.  *See* 15 U.S.C. §§ 2301, *et seq.*

56.　　Plaintiff and members of the Class were injured as a direct and proximate result of

Defendants' breach because (a) they would not have purchased Epiq Isolate Protein Powder if they had known that the product does not contain 20 grams of protein, and is not comprised of 100% protein isolate matrix that is made from 100% whey, milk, and casein isolates, and contains only 100% isolate proteins; (b) they paid a price premium for Epiq Isolate Protein Powder based on Defendants' express warranties; and (c) Epiq Isolate Protein Powder did not have the characteristics, uses, or benefits as promised, namely that the Product (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."

57.     Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and the Class are entitled to recover the damages caused to them by Defendants' breach of written and implied warranty, which either constitute the full purchase price of Epiq Isolate Protein Powder or the difference in value between Epiq Isolate Protein Powder as warranted and the products as sold.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiff and the Class in connection with the commencement and prosecution of this action.

58.     On March 20, 2015, prior to filing this action, a pre-suit notice letter was served on Defendants which complies in all respects with the MMWA.  Plaintiff sent Defendants a letter advising them that they are in violation of the MMWA and demanded that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's letter is attached hereto as Exhibit A.

## COUNT II
### (Breach of Express Warranty, U.C.C. § 2-313)

59.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

60.    Plaintiff brings this claim individually and on behalf of members of the Class and the Colorado and Hawaii Subclasses against all Defendants.  Plaintiff also brings this claim on behalf of the Kentucky Subclass against Defendant GNC.

61.    In connection with the sale of Epiq Isolate Protein Powder, Defendants issued written warranties.  Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers expressly warranted that Epiq Isolate Protein Powder was fit for its intended purpose by making the express warranties that Epiq Isolate Protein Powder: (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."

62.    Defendants' express warranties, and their affirmations of fact and promises made to Plaintiff and the Class regarding Epiq Isolate Protein Powder, became part of the basis of the bargain between Defendants and Plaintiff and the Class, thereby creating an express warranty that Epiq Isolate Protein Powder would conform to those affirmations of fact, representations, promises, and descriptions.

63.    Epiq Isolate Protein Powder does not, in fact, contain "20 Grams [Of] Protein" per serving, nor is it comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins." Instead, the Product contains free-form amino acids, including glycine, non-protein amino acids, including taurine, and other non-protein ingredients.

20

64.     Plaintiff and members of the Class were injured as a direct and proximate result of Defendants' breach because (a) they would not have purchased Epiq Isolate Protein Powder if they had known that the product does not contain 20 grams of protein, and is not comprised of 100% protein isolate matrix that is made from 100% whey, milk, and casein isolates, and contains only 100% isolate proteins; (b) they paid a price premium for Epiq Isolate Protein Powder based on Defendants' express warranties; and (c) Epiq Isolate Protein Powder did not have the characteristics, uses, or benefits as promised, namely that the Product (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."  As a result, Plaintiff and members of the Class have been damaged either in the full amount of the purchase price of Epiq Isolate Protein Powder or in the difference in value between Epiq Isolate Protein Powder as warranted and the products as sold.

65.     On March 20, 2015, prior to filing this action, a pre-suit notice letter was served on Defendants which complies in all respects with U.C.C. §§ 2-313, 2-607.  Plaintiff sent Defendants a letter advising them that they breached an express warranty and demanded that they cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's letter is attached hereto as Exhibit A.

## COUNT III
### (Breach Of The Implied Warranty Of Merchantability, U.C.C. § 2-314)

66.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

67.     Plaintiff brings this claim individually and on behalf of members of the Class and the Colorado and Hawaii Subclasses against all Defendants.  Plaintiff also brings this claim on

21

behalf of the Kentucky Subclass against Defendant GNC.

68.     Defendants are and were at all relevant times "merchants" within the meaning of the Uniform Commercial Code ("U.C.C.").  Defendants manufactured, distributed, and marketed Epiq Isolate Protein Powder, which is a "good" within the meaning of the UCC.  Consequently, Defendants impliedly warranted that Epiq Isolate Protein Powder was merchantable, including that it could pass without objection in the trade under the contract description, that it was fit for the ordinary purposes for which such goods are used, that it was of fair average quality within the description, that it was adequately labeled, and that it would conform to the promises or affirmations of fact made on its label.  *See* U.C.C. § 2-314(2).  However, each of these implied warranties were false with respect to the goods of the kind sold to Plaintiff and members of the Class and the Colorado, Hawaii, and Kentucky Subclasses.

69.     In reliance upon Defendants' skill and judgment and the implied warranties above, Plaintiff and Class members purchased Epiq Isolate Protein Powder.

70.     Epiq Isolate Protein Powder was not altered by Plaintiff or members of the Class.

71.     Epiq Isolate Protein Powder was defective when it left the exclusive control of Defendants.

72.     Defendants knew Epiq Isolate Protein Powder would be purchased and consumed by Plaintiff and members of the Class without additional testing.  Epiq Isolate Protein Powder was not of fair average quality within its description, was not adequately labeled, and does not conform to the promises or affirmations of fact made on its label.

73.     More specifically, Defendants breached their implied warranty of merchantability to Plaintiff and the Class because Epiq Isolate Protein Powder would not pass without objection

in the trade because it does not conform to the promises or affirmation of fact made on its label.

74.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class members were injured because (a) they would not have purchased Epiq Isolate Protein Powder if they had known that the product does not contain 20 grams of protein, and is not comprised of 100% protein isolate matrix that is made from 100% whey, milk, and casein isolates, and contains only 100% isolate proteins; (b) they paid a price premium for Epiq Isolate Protein Powder based on Defendants' implied warranties; and (c) Epiq Isolate Protein Powder did not have the characteristics, uses, or benefits as promised, namely that the Product (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."  As a result, Plaintiff and members of the Class have been damaged either in the full amount of the purchase price of Epiq Isolate Protein Powder or in the difference in value between Epiq Isolate Protein Powder are warranted and the products as sold.

75.     On March 20, 2015, prior to filing this action, a pre-suit notice letter was served on Defendants which complies in all respects with U.C.C. §§ 2-314, 2-607.  Plaintiff sent Defendants a letter advising them that they breached an implied warranty and demanded that they cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's letter is attached hereto as Exhibit A.

## COUNT IV
### (Unjust Enrichment/Common Law Restitution)

76.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

77.     Plaintiff brings this claim individually and on behalf of the members of the Class

and the Colorado, Hawaii, and Kentucky Subclasses against all Defendants.

78.     Plaintiff and members of the Class conferred benefits on Defendants by purchasing Epiq Isolate Protein Powder.

79.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchases of Epiq Isolate Protein Powder.  Retention of those monies under these circumstances is unjust and inequitable because of Defendants' Misrepresentations about Epiq Isolate Protein Powder, which caused injuries to Plaintiff and members of the Class because they would not have purchased Epiq Isolate Protein Powder if the true facts had been known.

80.     Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and members of the Class for their unjust enrichment, as ordered by the Court.

## COUNT V
### (Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, *et seq.*)

81.     Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

82.     Plaintiff brings this claim individually and on behalf of the members of the Colorado Subclass against all Defendants.

83.     Each of the Defendants are a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101, *et seq.*

84.     Plaintiff is a "consumer" for purposes of § 6-1-113(1)(a) of the CCPA who purchased Epiq Isolate Protein Powder.

85.     In the course of its business, Defendants participated in the deceptive trade practices that violated the CCPA, as described herein.

86.     As alleged above, Defendants made the Misrepresentations about Epiq Isolate Protein Powder.  Each of these statements contributed to the deceptive context of Defendants' Misrepresentations as a whole.

87.     Defendants engaged in deceptive trade practices prohibited by the CCPA, including, but not limited to:  (1) knowingly making false representations as to the characteristics, uses, and benefits of Epiq Isolate Protein Powder as described herein; (2) representing that Epiq Isolate Protein Powder was of a particular quality that Defendants knew or should have known it was not; (3) advertising Epiq Isolate Protein Powder with the intent not to sell it as advertised; and (4) failing to disclose material information concerning Epiq Isolate Protein Powder.

88.     Defendants knew that Epiq Isolate Protein Powder does not contain "20 Grams [Of] Protein" per serving, and that it is not comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."  Nevertheless, Defendants marketed the Product as such.

89.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics, ingredients, and benefits of Epiq Isolate Protein Powder to induce consumers to purchase same.  Thus, Defendants' practices are directed at consumers, and significantly impact the public as actual or potential consumers of Epiq Isolate Protein Powder.

90.     Plaintiff and members of the Colorado Subclass were injured because (a) they

would not have purchased Epiq Isolate Protein Powder if they had known that the product does not contain 20 grams of protein, and is not comprised of 100% protein isolate matrix that is made from 100% whey, milk, and casein isolates, and contains only 100% isolate proteins; (b) they paid a price premium for Epiq Isolate Protein Powder based on Defendants' Misrepresentations; and (c) Epiq Isolate Protein Powder did not have the characteristics, uses, or benefits as promised, namely that the Product (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."  As a result, Plaintiff and members of the Colorado Subclass have been damaged either in the full amount of the purchase price of Epiq Isolate Protein Powder or in the difference in value between Epiq Isolate Protein Powder as warranted and the products as actually sold.

91.     On behalf of himself and other members of the Colorado Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover statutory damages in the amount of $500, three times actual damages, and reasonable attorneys' fees.

### COUNT VI
**(Violation of Hawaii Unfair Competition and Practices Law, Haw. Rev. Stat. §§ 480, *et seq.*)**

92.     Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

93.     Plaintiff brings this claim individually and on behalf of the members of the Hawaii Subclass against all Defendants.

94.     Hawaii's Revised Statute § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

95.     Defendants' conduct as set forth herein constitutes unfair methods of competition and unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480-2, because Defendants' acts and practices, including the Misrepresentations that Epiq Isolate Protein Powder (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins," offended established public policy, and because the harm it causes to consumers greatly outweighs any benefits associated with those practices. Defendants' conduct also impaired competition within the protein supplement market and has prevented Plaintiff and members of the Hawaii Subclass from making fully informed decisions about whether to purchase Epiq Isolate Protein Powder and/or the price to be paid to purchase Epiq Isolate Protein Powder.

96.     Defendants' Misrepresentations were material because Plaintiff and members of the Hawaii Subclass (a) would not have purchased Epiq Isolate Protein Powder if they had known that the product does not 20 grams of protein per serving, and is not comprised of a 100% protein isolate matrix that is made from 100% whey, milk, and casein isolates and contains only 100% isolate; and (b) paid a price premium for Epiq Isolate Protein Powder based on Defendants' Misrepresentations.

97.     Defendants' acts or practices as set forth above occurred in the conduct of trade or commerce.

98.     Plaintiff and members of the Hawaii Subclass have suffered injury, including the loss of money, as a result of Defendants' unfair methods of competition and unfair or deceptive acts or practices.

99.    Plaintiff and members of the Hawaii Subclass have been injured because (a) they would not have purchased Epiq Isolate Protein Powder if they had known that the product does not contain 20 grams of protein, and is not comprised of 100% protein isolate matrix that is made from 100% whey, milk, and casein isolates, and contains only 100% isolate proteins; (b) they paid a price premium for Epiq Isolate Protein Powder based on Defendants' Misrepresentations; and (c) Epiq Isolate Protein Powder did not have the characteristics, uses, or benefits as promised, namely that the Product (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."  As a result, Plaintiff and members of the Hawaii Subclass have been damaged either in the full amount of the purchase price of Epiq Isolate Protein Powder or in the difference in value between Epiq Isolate Protein Powder as warranted and the products as actually sold.

100.    In addition to damages in amounts to be proven at trial, Plaintiff and the members of the Hawaii Subclass seek attorneys' fees, costs of suit, and treble damages.

101.    Plaintiff and the members of the Hawaii Subclass also seek injunctive relief to enjoin Defendants from continuing their unfair competition and unfair or deceptive acts or practices.

## COUNT VII
### (Violation of Hawaii's Uniform Deceptive Trade Practice Act, Hawaii Rev. Stat. §§ 481A, *et seq.*)

102.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

103.    Plaintiff brings this claim individually and on behalf of the members of the

28

Hawaii Subclass against all Defendants.

104.    Defendants participated in unfair or deceptive acts or practices that violated the

Uniform Deceptive Trade Practice Act ("UDAP"), Haw. Rev. Stat. §§ 481A, *et seq.*, as

described herein.

105.    By making the Misrepresentations, Defendants engaged in deceptive business

practices prohibited by the UDAP, including but not limited to:  (1) knowingly making false

representations as to the characteristics, uses, and benefits of Epiq Isolate Protein Powder as

described herein; (2) representing that Epiq Isolate Protein Powder was of a particular quality

that Defendants knew or should have known it was not; (3) advertising Epiq Isolate Protein

Powder with the intent not to sell it as advertised; and (4) failing to disclose material information

concerning Epiq Isolate Protein Powder.

106.    As alleged above, Defendants made the Misrepresentations about Epiq Isolate

Protein Powder, all of which were either false or misleading.  Each of these Misrepresentations

contributed to the deceptive context of Defendants' representations as a whole.

107.    Defendants knew that Epiq Isolate Protein Powder does not contain "20 Grams

[Of] Protein" per serving, and that it is not comprised of protein from a "100% Protein Isolate

Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100%

isolate proteins."  Nevertheless, Defendants marketed the Product as such.

108.    Whether or not Epiq Isolate Protein Powder (i) has "20 Grams [Of] Protein" per

serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from

"100% whey, milk, and casein isolates" and contains "only 100% isolate proteins," are facts that

a reasonable consumer would consider important in selecting a protein supplement for purchase.

When Plaintiff bought Epiq Isolate Protein Powder for personal, family, or household purposes, he reasonably expected the Product (a) had 20 grams of protein per serving, and (b) contained protein from a 100% protein isolate matrix that is made from 100% whey, milk, and casein isolates and contains only 100% isolate proteins.

109.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true quality of Epiq Isolate Protein Powder and the true quantity of protein in the Product.

110.    As a result of their violations of the UDAP as detailed above, Defendants caused actual damages to Plaintiff and the members of the Hawaii Subclass, and, if not stopped, will continue to harm future consumers of Epiq Isolate Protein Powder.

111.    Plaintiff and the members of the Hawaii Subclass seek monetary damages and an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorneys' fees, and any other just and proper relief available under the UDAP.

**COUNT VIII**
**(Violation of the Kentucky Consumer Protection Act,**
**Ky. Rev. Stat. §§ 367.110, *et seq.*)**

112.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

113.    Plaintiff brings this claim individually and on behalf of the members of the Kentucky Subclass against all Defendants.

114.    Defendants misrepresented that Epiq Isolate (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins," with the

30

intent that Plaintiff and members of the Kentucky Subclass would rely on the Misrepresentations in deciding to purchase Epiq Isolate Protein Powder.

115.    Plaintiff did, in fact, rely on the Misrepresentations in deciding to purchase Epiq Isolate Protein Powder.

116.    Through those misleading and deceptive statements and false promises, Defendants violated the Kentucky Consumer Protection Act ("KCPA").

117.    The KCPA applies to Defendants' transactions with Plaintiff because Defendants' deceptive scheme was carried out in Kentucky and affected Plaintiff in Kentucky.

118.    Plaintiff and the members of the Kentucky Subclass relied on Defendants' Misrepresentations in connection with their decision to purchase Epiq Isolate Protein Powder.

119.    As a direct and proximate result of Defendants' deceptive conduct and violation of the KCPA, Plaintiff and the members of the Kentucky Subclass have sustained economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT IX
### (Negligent Misrepresentation)

120.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

121.    Plaintiff brings this claim individually and on behalf of the members of the Class and the Colorado, Hawaii, and Kentucky Subclasses against all Defendants.

122.    As discussed above, Defendants represented that Epiq Isolate Protein Powder:  (i) has "20 Grams [Of] Protein" per serving; and (ii) is comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only

100% isolate proteins," but failed to disclose that the product contains free-form amino acids, including glycine, non-protein amino acids, including taurine, and other non-protein ingredients. Thus, the Product does not contain "20 Grams [Of] Protein" per serving, nor is it comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."  Rather, independent laboratory testing shows the Product only contains 15 grams of protein, when accounting for glycine and taurine. Defendants had a duty to disclose this information.

123.    At the time Defendants made these representations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

124.    At an absolute minimum, Defendants negligently misrepresented and/or negligently omitted material facts about Epiq Isolate Protein Powder.

125.    The negligent misrepresentations and omissions made by Defendants, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase Epiq Isolate Protein Powder.

126.    Plaintiff and Class members would not have purchased Epiq Isolate Protein Powder if the true facts had been known.

127.    The negligent actions of Defendants caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT X
### (Fraud)

128.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

129.     Plaintiff brings this claim individually and on behalf of the members of the Class and the Colorado, Hawaii, and Kentucky Subclasses against all Defendants.

130.     As discussed above, Defendants made false and misleading representations, including the Misrepresentations, and failed to disclose that the Epiq Isolate Protein Powder contains free-form amino acids, including glycine, non-protein amino acids, including taurine, and other non-protein ingredients.  Thus, the Product does not contain "20 Grams [Of] Protein" per serving, nor is it comprised of protein from a "100% Protein Isolate Matrix" that is made from "100% whey, milk, and casein isolates" and contains "only 100% isolate proteins."  Rather, independent laboratory testing shows the Product only contains 15 grams of protein, when accounting for glycine and taurine.  Defendants had a duty to disclose this information.

131.     The false and misleading representations and omissions were made with knowledge of their falsehood.

132.     The false and misleading representations and omissions were made by Defendants, upon which Plaintiff and members of the Class and Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and Class members to purchase Epiq Isolate Protein Powder.

133.     The fraudulent actions of Defendants caused damage to Plaintiff and members of the Class and Subclass, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

134.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendants, as follows:

33

A.    For an order certifying the nationwide Class and the Colorado, Hawaii, and Kentucky Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as a representative of the Class and the Colorado, Hawaii, and Kentucky Subclasses and Plaintiff's attorneys as Class Counsel to represent the Class and the Colorado, Hawaii, and Kentucky Subclasses;

B.    For an order declaring that Defendants' conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiff, the nationwide Class, and the Colorado, Hawaii, and Kentucky Subclasses on all counts asserted herein;

D.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem proper; and

H.    For an order awarding Plaintiff, the Class, and the Colorado, Hawaii, and Kentucky Subclasses their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: March 27, 2015

Respectfully submitted,

**BURSOR & FISHER, P.A.**


By:_____*/s/ Annick M. Persinger*_____
                Annick M. Persinger

Annick M. Persinger
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email:  apersinger@bursor.com

*Attorney for Plaintiff*